## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JULIE A. SU, Acting Secretary of Labor,   ) | |
|                        ) | |
|        Plaintiff,            ) | |
|                        ) | |
| v.                              ) | Civil No. 24-00099-JRT-TNL |
|                        ) | |
| BCBSM, INC.,                  ) | |
|                        ) | |
|        Defendant.          ) | |

## ACTING SECRETARY OF LABOR'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant BCBSM serves as the third-party administrator for hundreds of employer-sponsored, self-funded health benefit plans in Minnesota governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq.  Among BCBSM's central functions is to determine the amount that the plans owe providers for services rendered to plan participants.  The complaint filed by the Acting Secretary of Labor ("Secretary") alleges that, for years, BCBSM has been systematically padding the amounts payable by the plans to providers that participate in BCBSM's network to compensate those providers up front for their liability under a Minnesota tax on provider revenues.  BCBSM has done this—to the tune of $66.8 million between 2016 and 2020 alone—even though the providers do not include the tax in their invoices or otherwise request that the plans pay for the tax.  And BCBSM has done this even though the plans nowhere agreed to compensate providers for their tax liability or otherwise authorized BCBSM to charge them for it.  Because BCBSM's decision to surreptitiously pass the tax on to the plans is entirely unilateral, that decision is a quintessential exercise of discretionary authority over the plans, thus rendering it a fiduciary function subject to ERISA's strict fiduciary duties.  And because it plainly is not in the plans'

interest to pay a tax they do not owe and did not agree to pay, BCBSM's decision to charge it to them anyway was both disloyal and violative of ERISA's prohibited transaction rules.

In moving to dismiss the Secretary's complaint, BCBSM notably does not dispute that it caused the plans to pay the tax liability of its participating providers. It instead contends—contrary to the complaint's allegations—that the plans somehow agreed to this arrangement, and that BCBSM only robotically implemented the plans' wishes and did not act as a discretion-wielding fiduciary. But the (incomplete) documents BCBSM attaches to its motion to establish this point only provide further reason to deny its motion. Those documents nowhere mention a provider tax or otherwise inform the plans that BCBSM will be adding a payment for the tax to the claims amounts payable to BCBSM's participating providers. With no specific language to point to, BCBSM hangs its hat entirely on the notion that the Plans agreed to pay whatever BCBSM promised to pay its participating providers, and that because BCBSM agreed to compensate its providers for their tax liability, so too did the plans. But that simplistic syllogism ignores other language providing that the plans agreed only to pay for "medical services." A future tax liability—one the providers did not even include in their invoices for such services—is not a "medical service." Indeed, BCBSM's agreement with the plans elsewhere makes clear that BCBSM can charge the plans for provider taxes only where a "regulatory authority" deems them due, not on BCBSM's own whim. At best for BCBSM, the opaque language to which it clings—coupled with other contractual language that directly undermines its interpretation—only demonstrates the need for further litigation, not dismissal.

**BACKGROUND**

**A.  BCBSM's Management and Administration of the Plans**

BCBSM is a Minnesota nonprofit health service plan corporation.  *See* Compl. ¶¶ 4, 9; *see also* Corporate Disclosure, ECF No. 8.  As alleged in the Secretary's complaint, since January 1, 2015, BCBSM has provided third-party administrative services to approximately 371 self-funded employee welfare benefit plans located in Minnesota (the "Plans").  Compl. ¶¶ 4, 7.  The Plans are established or maintained by employers in Minnesota to provide medical, surgical, hospital care or benefits, or benefits in the event of sickness, accident, or disability.  *Id*. ¶ 8.  The Plans are funded through contributions from employee participants and the employers sponsoring those plans.  *Id*.; *see also* Def.'s Ex. 2 at 85.

BCBSM's obligations as third-party administrator to the Plans are governed by the administrative service agreements ("ASAs") it enters with the employers who sponsor the Plans and the terms of the Plans themselves.  Compl. ¶ 9.  The ASAs accord BCBSM with discretionary authority to process, approve, and deny claims for benefits filed by or on behalf of participants and beneficiaries of the Plans.  *Id*. ¶ 11; *see also* Def.'s Ex. 1, Art. II, §§ 1, 6.  Under the ASAs, "Blue Cross agrees to act as the named fiduciary of the Plans[s] for purposes of Claims" and has "complete, final and discretionary authority to make factual determinations and to construe disputed or ambiguous terms of the Plan, except as otherwise provided by law." Def.'s Ex. 1, Art. II § 6.  Blue Cross reviews "all Claims to determine if they are payable under the terms of the Plan," and "[i]f the Claim is payable under the Plan, Blue Cross will pay the Claim, and advise the Employer of amounts due Blue Cross for reimbursement of Claims Paid." Def.'s Ex. 1, Art. II, §§ 1(a), (b).  The ASAs define "Claim" as a "request for payment of medical services" covered by the Plan.  Compl. ¶ 9; Def.'s Ex. 1, Art. I, § 7.  "Claims Paid" is defined as

the "dollar amount [BCBSM] pays under the Plan."  Def.'s Ex. 1, Art. I, § 8.  The ASAs require

the payment of provider taxes only where "a regulatory authority" determines that provider taxes

are due, and only if BCBSM "is required to pay these taxes."  *Id*. Art. V § 4.  Indeed, the fee

schedules attached to the ASAs—which set out the amounts due to BCBSM for their services,

including a weekly charge for "Claims Paid"—do not list provider taxes.  *Id.* Art. III, § 1 & Ex.

A.

     The terms of the Plans are set out in a Summary Plan Description ("SPD").  Compl. ¶¶

13–14; Def.'s Ex. 1, Art. I § 22.  As with the ASAs, the SPDs also identify BCBSM as the

claims administrator.  Compl. ¶ 14; Sec'y's Ex. 1 at 1, 86.  And like the ASAs, the SPDs define

"claim" in terms of a payment for "covered services."  Sec'y's Ex. 1 at 72–73, 85.  A "covered

service" is defined as a "*health service or supply* that is eligible for benefits when performed and

billed by an eligible provider."  *Id*. at 86 (emphasis added).  The amount payable under the Plans

for the covered service differs depending on whether the provider offering the service participates

in BCBSM's network ("Participating Providers"), but in either case the payment is still only for

the "covered service."  Participating Providers are paid an "allowed amount," *id*. at 56, which the

SPD defines as "the negotiated amount of payment that the in-network provider has agreed to

accept as full payment for a *covered service* at the time [a] claim is processed."  *Id*. at 84

(emphasis added).  The SPDs do not address the payment of taxes except in the context of "inter-

plan arrangements" involving a participant's access to care outside Minnesota.  *See id*. at 50, 51;

*see also* Def.'s Ex. 1, Art. II § 2(d) & D.[1]

---

[1] In support of Defendant's motion to dismiss, BCBSM filed an incomplete copy of an SPD as
Exhibit 2.  *See* ECF No. 15.  Defendant's exhibit is incomplete because it does not include all
relevant definitions and omits provisions regarding the filing of claims and the payment of taxes.
Under the Federal Rules of Evidence, the Secretary is entitled to produce and have the Court
consider the entire SPD.  *See* Fed. R. Evid. 106; *Frymire-Brinati v. KPMG*, 2 F.3d 183, 188 (7th

### B.  BCBSM Charged the Plans for its Providers' MinnesotaCare Tax Liability

Since 1994, Minnesota has imposed a tax on the "gross income" that hospitals, surgical centers, and health care providers derive from payments for patient services.  *See* Minn. Stat. § 295.52, Subdivision 2; Minn. Stat. § 295.50, Subdivision 3 (MNCare Tax).[2]  Because the tax is based on a provider's gross receipts, it is neither a sales tax nor a transaction-based tax.  *See Bloom v. O'Brien*, 841 F. Supp. 277, 281 (D. Minn. 1993).  Instead, the tax liability is imposed on the entity with the legal right to collect the gross receipts.  *See* Minn. Dep't of Revenue, Revenue Notice 94-l2 (Modified Nov. 8, 2004) (2004 WL 2608706).  "Generally, this means that the entity receiving the payment for the services from the patient or third[-]party payer is the taxpayer."  *Id*.

Minnesota law allows health care providers to transfer their MNCare Tax obligation to third-party contracts for the purchase of health care services on behalf of patients, but the providers must specifically request the tax transfer.  *See* Minn. Stat. § 295.582, Subd. l(a)(1); *see also* Minn. Dep't of Com., Bulletin 94-3 ¶ 1 (July 18, 1994).  If requested to do so, the third-party purchaser of health care services must pay the MNCare Tax imposed on the provider.  *See* Minn. Stat. § 295.582, Subd. l(c)(1).  A third-party purchaser of health services includes service plan corporations like BCBSM.  *Id*; Minn. Stat. § 60C.13, Subd. 4.  Providers may also recover their tax obligations by other methods, such as by "increasing fees or charges."  *See* Minn. Stat. § 295.582, Subd. (e).

---

Cir. 1993); *see also Bond v. Cerner Corp.*, 309 F.3d 1064, 1067–68 (8th Cir. 2002) (all parts of a contract must be given effect).  The Secretary therefore files (under temporary seal) as her Exhibit "1" a complete SPD that BCBSM produced to the Department of Labor during its investigation.

[2]  The current tax rate is 1.6% of gross income.  *See* www.revenue.state.mn.us/minnesotacare-taxes.  For year 2022, the tax rate was 1.8%.  *Id*.

BCBSM enters into contracts with Minnesota providers to form a provider network. Compl. ¶ 10. Under those contracts, BCBSM agreed to compensate its Participating Providers for the MNCare Tax. Compl. ¶ 21; Def.'s Ex. 4 at 15. But BCBSM makes good on this promise by having the Plans pay its providers' tax liability. Specifically, when BCBSM receives claims for services rendered by its Participating Providers to Plan participants, BCBSM calculates the amount due under the Plan, and then adds an additional amount for the MNCare Tax to the amount payable to the Participating Provider. Compl. ¶¶ 22-23. BCBSM then submits invoices to the Plans seeking reimbursement for the full amount it paid the provider, including the amount it added for the MNCare Tax. *Id.* ¶ 23. BCBSM's invoices to the Plans do not contain a breakdown showing that the claims paid amount includes the MNCare Tax. *Id.* Since January 1, 2016, BCBSM has collected at least $66.8 million from the Plans as payment for its network providers' MNCare Tax obligations. Compl. ¶¶ 2, 22, 24. However, neither the ASAs nor the SPDs authorize BCBSM to collect the MNCare Tax from the Plans. *Id*. ¶¶ 25, 28–29. Nor did BCBSM obtain approval from the Plans' administrators (or other independent fiduciaries) to include the MNCare Tax liability of BCBSM's network providers in the claim amounts payable by the Plans. *Id*. ¶ 31.

Moreover, the providers in BCBSM's network did not transfer their liability for the MNCare Tax to the Plans. *Id.* ¶ 21. BCBSM's provider manual requires providers to submit claims electronically to BCBSM and if the provider intends to charge the group purchaser for the MNCare Tax, the provider must identify the tax in the AMT tax segment portion of the claim remittance to BCBSM. *See* Sec'y's Ex. 2 at 8-30, 8-40.[3] The providers servicing participants of

---

[3]  In support of Defendant's motion to dismiss, it filed an incomplete copy of the Provider Manual as Exhibit 3. *See* ECF No. 13-2. Under the rule of completeness, the Secretary is introducing other relevant portions of the manual, marked as Exhibit "2," addressing claims

the Plans did not include the MNCare Tax in their claims remittances to BCBSM.  Compl. ¶ 21.

Rather, BCBSM, without telling the Plans, added the tax to the claims-payment amount it

charged the Plans.  *Id.* ¶¶ 22–23.  As a result, BCBSM "exercised its discretionary authority over

claims administration to cause the Plans to pay the providers' obligations under the MNCare Tax

based on billing practices that obscured the taxes it collected from the Plans."  *Id.* ¶ 32.

    **C.  The Secretary's Complaint**

    On January 12, 2024, the Secretary filed a complaint alleging that BCBSM has for years

caused the Plans to pay BCBSM's Participating Providers' MNCare Tax liability, even though

neither the ASAs nor the SPDs permitted BCBSM to do so.  By unilaterally deciding to pass the

tax on to the Plans, BCBSM exercised discretionary authority over the Plans, thus making that

decision a fiduciary function.  And because the Plans did not agree to pay the providers'

MNCare Tax and were not otherwise responsible for it, the complaint alleges that BCBSM

violated ERISA in three ways in charging the Plans for it anyway: (1) causing the Plans to

transfer Plan assets for the benefit of a party-in-interest to the Plans (BCBSM), in violation of 29

U.S.C. § 1106(a)(1)(D) (Count I); (2) engaging in acts of self-dealing and representing parties

with interests adverse to the Plans (its Participating Providers), in violation of 29 U.S.C. §

1106(b)(1)-(2); and (3) failing to act "solely in the interests of the participants and beneficiaries"

of the Plans, in violation of ERISA's duty of loyalty, 29 U.S.C. § 1104(a)(1)(A).  *Id.* ¶¶ 34–56.

The complaint contends that BCBSM's actions caused the Plans to suffer losses of at least $66.8

million.  *Id.* ¶¶ 2, 24.  Based on those allegations, the Secretary seeks to restore losses to the

---

filing procedures and related requirements for requesting reimbursements for tax payments.  *See*
Fed. R. Evid. 106 & Notes of Advisory Committee.

Plans resulting from BCBSM's fiduciary breaches and prohibited transactions, as well as other injunctive and equitable relief. *Id.* at 12 (Prayer).

## STANDARD OF REVIEW

BCBSM moves to dismiss under both Rule 12(b)(1) and 12(b)(6). "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729, n.6 (8th Cir. 1990). In a facial attack, "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)," whereas in a factual attack—i.e., one where "the court considers matters outside the pleadings"—"the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* Though it attaches documents to support its motion, BCBSM concedes that those documents are "embraced" in the Secretary's complaint, and thus do not qualify as documents outside the pleadings. *See* Def.'s Mem., ECF No. 11, at 13 (citing *Gorog v. Best Buy Co.*, 760 F.3d 787, 791 (8th Cir. 2014)).

Because BCBSM's motion is confined to the complaint and the documents it embraces, the Court's review of the motion is governed by the Rule 12(b)(6) standard, under which the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for relief that is plausible on its face. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *See Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although a complaint "does not need detailed factual allegations" it must include more "than labels and conclusions, and a formulaic

recitation of the elements" to meet the plausibility standard.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings."  *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

## ARGUMENT

### I.   The Secretary Has Standing

BCBSM first moves to dismiss the entirety of the Secretary's complaint for lack of standing.  Def.'s Mem., ECF No. 11, at 16.  Constitutional standing requires an "injury in fact" that is (1) "concrete and particularized" and "actual or imminent," (2) traceable to the defendant, and (3) "redress[able] by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The complaint alleges BCBSM violated ERISA's fiduciary standards and prohibited transaction rules by charging the Plans for its Participating Providers' MNCare Tax liability that they did not agree to cover and for which they were not liable, totaling roughly $66.8 million between 2016 and 2020 alone.  Compl. ¶¶ 4, 11, 14, 21, 23, 25–31.  Thus, the complaint adequately pleads a concrete injury in fact to the Plans based on their economic losses.  *See TransUnion LLC v. Ramirez*, 540 U.S. 413, 425 (2021) ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").  That injury, moreover, is directly traceable to BCBSM's actions, and would be redressed by the loss-restoration remedy the Secretary seeks in her complaint.

According to BCBSM, however, the complaint fails to plead an injury because "there is no allegation that any Plan would not have paid the same reimbursement to Blue Cross had Blue Cross done exactly what DOL maintains the law requires – namely, 'explicitly disclos[ed] the MNCare Tax payment' on invoices."  Def.'s Mem., ECF No. 11, at 16.  After all, BCBSM

continues, the tax amounts are "relatively small," so "it would be impermissible speculation that Plans would somehow have balked" at paying the tax had it been specifically itemized. *Id.* at 16–17. BCBSM thus contends that this case is no different from others disposed of for lack of standing where the plaintiff "would be in the same position" even if the "alleged illegal acts had not occurred." *Id.* at 15.

There is just one problem with BCBSM's argument: It mischaracterizes the "alleged illegal act" set forth in the Secretary's complaint, and thus ponders an irrelevant counterfactual. The alleged ERISA violation is not BCBSM's failure to disclose the tax to the Plans on invoices, and speculation as to what the Plans would have done had the tax been disclosed is not the relevant counterfactual. Rather, the violation is BCBSM's decision to pay the tax on the Plans' behalf and then charge the Plans for it notwithstanding that neither the ASAs nor SPDs authorized BCBSM to do so, and notwithstanding that the Plans were not otherwise liable for the tax. Compl. ¶¶ 25–31. Had *that* illegal act not occurred—the one alleged in the complaint—the Plans plainly would not "be in the same position" they are today but would have at least $66.8 million in additional assets. In short, BCBSM's fiduciary breaches and prohibited transactions caused the Plans to pay charges for which they were not responsible, which resulted in the Plans suffering a pocketbook injury that qualifies as a textbook injury in fact.

But even taking on its own terms BCBSM's counterfactual in which BCBSM lists the tax on the Plans' invoices, BCBSM's standing argument still fails. BCBSM contends it would be "impermissible speculation" to assume that the Plans would not be anything but happy to pay the tax had it appeared on their invoices, given the "small amounts" at issue. Def.'s Mem., ECF No. 11, at 16–17. This contention is equal parts galling and wrong: Again, the complaint alleges that the Plans *did not agree to pay* for the MNCare Tax, and so the notion that they would willingly

do so anyway if it were itemized in their invoices not only is itself "impermissible speculation," but entirely nonsensical. There is no reason to believe that Plan fiduciaries, when presented with BCBSM's improper MNCare Tax charges, would have agreed to have the Plans pay them when there was no requirement to do so in the ASAs and SPDs. ERISA requires fiduciaries to discharge their duties for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering a plan. 29 U.S.C. § 1104(a)(1)(A). Paying providers for their MNCare Tax obligations when not otherwise required to do so would neither assist in the provision of benefits nor defray plan expenses (in fact, it would add to them). By suggesting those Plan fiduciaries would have paid the MNCare Tax despite the Plans' lacking any obligation to do so, BCBSM's counterfactual assumes that the Plans were overseen by disloyal fiduciaries willing to cause the Plans to incur improper expenses contrary to the statute and their duties to the Plans. *See* 29 U.S.C. § 1104(a)(1)(A)(ii), (B); *Burke v. Pitney Bowes Inc. Long Term Disability Plan*, 640 F. Supp. 2d 1160, 1176 (N.D. Cal. 2009) ("As a fiduciary with duties of care and loyalty to all participants, the administrator's role is to grant meritorious claims but to deny non-meritorious claims in order to protect the plan's assets for the benefit of other participants); *see also* Restatement (Third) of Trusts § 76, cmt. d (Am. Law Inst. 2007) (trustee has a duty to preserve trust assets). Thus, BCBSM's argument fails because it requires the Court to accept as a counterfactual that the Plans' administrators in this case would commit fiduciary breaches and subject themselves to liability for the benefit of BCBSM.

**II.  The Complaint States Claims that BCBSM Breached its Fiduciary Duties and Violated ERISA's Prohibited Transaction Rules in Charging the Plans for the MNCare Tax without Authorization**

ERISA "provides that not only the persons named as fiduciaries by a benefit plan, but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets, is an ERISA fiduciary." *Mertens v. Hewitt Assocs*, 508 U.S. 248, 251 (1993).  A party designated "in the plan instrument" as a fiduciary is a "named fiduciary," 29 U.S.C. § 1102(a)(2), and qualifies as a fiduciary under ERISA's definition of the term because it "*has* any discretionary authority or discretionary responsibility in the administration of [a] plan." 29 U.S.C. § 1002(21)(A)(iii) (emphasis added); *Peters v. Aetna*, 2 F.4th 199, 227 (4th Cir. 2021). But even a person not explicitly named as a fiduciary can nevertheless qualify as such—referred to as a "functional fiduciary"—"to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i).  ERISA's definition of functional fiduciary expands the universe of persons subject to fiduciary duties beyond the common law definition.  *See Mertens,* 508 U.S. at 262.

Fiduciaries are bound by ERISA's strict fiduciary standards, the "highest known to the law." *Braden*, 588 F.3d at 598.  Among them is the duty of loyalty, which requires that fiduciaries discharge their duties with "an eye single" to the interests of trust beneficiaries and participants, *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982), and for the "exclusive purpose" of providing benefits and defraying plan expenses.  *See* 29 U.S.C. § 1104(a)(1)(A); 3 *Scott and Ascher on Trusts* § 17.2.3 at 1109 (5th ed. 2007); *Skelton v. Radisson Hotel*, 33 F.4th 968, 977 (8th Cir. 2022).  Fiduciaries are also bound by ERISA's prohibited transaction rules outlined in section 406, "which supplements the fiduciary's general duty of loyalty to the plan's

beneficiaries, section 404(a), by categorically barring certain transactions deemed 'likely to injure the pension plan.'"  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000) (citation omitted).  Section 406(b) prohibits fiduciaries from, among other things, dealing with plan assets in their own interest and representing the interests of parties in transactions involving the plan whose interests are adverse to the plan's.  *See* 29 U.S.C. § 1106(b)(1)-(2).  Section 406(a)(1)(D) prohibits fiduciaries from causing plans to transfer their assets for the benefit of a "party-in-interest" to the plan, which includes, among other entities, a plan fiduciary.  *See* 29 U.S.C. § 1106(a)(1)(D); 29 U.S.C. § 1002(14)(A) (defining "party in interest" as including plan fiduciaries).

In this case, the Secretary sufficiently alleged BCBSM's fiduciary status and related ERISA violations in connection with its unauthorized decision to charge the Plans for its providers' MNCare Tax liability.  As to fiduciary status, and as alleged in the complaint, the Plans are established and maintained through the ASAs and the SPDs.  Compl. ¶¶ 8–9, 13; Def.'s Ex. 1, Art. I § 22, Art. II § 1.  Under the ASAs, "Blue Cross agrees to act as the named fiduciary of the Plans[s] for purposes of Claims" and has "complete, final and discretionary authority to make factual determinations and to construe disputed or ambiguous terms of the Plan[s], except as otherwise provided by law."  Def.'s Ex. 1, Art. II § 6; Compl. ¶ 11.  Similarly, the "Plan documents," identified as the SPDs, *see* Def.'s Ex. 1, § 22, name BCBSM as the "Claims Administrator" with authority to decide and pay claims.  *See* Sec'y's Ex. 1 at 44, 57, 73, 83, 86; Compl. ¶ 14.  Because BCBSM is identified in the plan instruments as a fiduciary and is conferred discretionary authority to decide claims, BCBSM is a named fiduciary of the Plans.

*See* 29 U.S.C. § 1002(21)(A)(iii); 29 U.S.C. § 1102(a)(2).[4]  And BCBSM acted as such when taking the actions at issue here—i.e., charging the Plans, without authorization, for its network providers' MNCare Tax liability.  Compl. ¶¶ 21–22, 25, 29.  As confirmed in the ASAs, BCBSM collects payment for claims from the Plans by invoicing the employers.  *See* Def.'s Ex. 1, Art. II § 1(b), Art. III § 1.  Through that administrative mechanism, BCBSM caused the Plans to pay for its Participating Providers' MNCare Tax liabilities that BCBSM assumed as an obligation for itself.  Compl. ¶¶ 21–22, 25, 29.

But even if BCBSM were not a named fiduciary, the Secretary sufficiently alleged that BCBSM acted as a functional fiduciary when charging the Plans for its obligation to cover its providers' MNCare Tax liability.  Because the Plans did not agree to cover that liability, BCBSM's decision to pass the tax on to the Plans anyway was an exercise of discretionary authority over the Plans' management.  *See* Compl. ¶¶ 8, 14, 16, 17, 26–31; 29 U.S.C. § 1002(21)(A)(i); *Peters v. Aetna*, 2 F.4th 199, 231 (4th Cir. 2021) ("[A] reasonable factfinder could determine that Aetna acted as [a fiduciary] when it avoided payment of Optum's administrative fee by causing Peters and the Plan to shoulder that expense and then paid the fees out of the Plan to Optum.").

As to liability, because neither the ASAs nor the SPDs authorized BCBSM to impose those costs on the Plans, BCBSM violated ERISA's duty of loyalty and prohibited transaction rules in passing them on to the plans anyway in order to satisfy its own obligation to its Participating Providers.  Indeed, because it is not "solely in the interests" of the Plans to charge

---

[4]  Because the ASAs identify the SPDs as the official plan documents, the SPDs serve as the written instruments of the Plans.  *See MBI Energy Servs. v. Hoch*, 929 F.3d 506, 511 (8th Cir. 2019) ("[W]e hold that the SPD is the Plan's written instrument because it is the only document providing benefits.").

them for a tax liability that they did not agree to pay and for which they are not liable, BCBSM's decision to do so violates ERISA's duty of loyalty.  29 U.S.C. § 1104(a)(1)(A).  And because the only interests served by BCBSM's actions are its own (to satisfy its independently incurred obligation to its providers) and its providers' (in having their tax liability paid), BCBSM's decision to pass the tax on to the Plans also violates ERISA's ban on fiduciary self-dealing and representing the interests of parties adverse to the plans.  29 U.S.C. § 1106(b)(1)-(2).

## III.   BCBSM's Arguments that the Secretary Fails to State a Claim Lack Merit

BCBSM contends that the Secretary fails to state fiduciary-breach and prohibited-transaction claims for three separate but occasionally overlapping reasons, each of which are meritless.  First, BCBSM argues that it did not act as a fiduciary in passing the MNCare Tax on to the Plans because the Plans fully authorized it, but that contradicts the complaint's well-pled allegations and in any case is wrong on the facts.  Second, BCBSM says that it did not breach its fiduciary duties for the same reason it says it was not a fiduciary—that supposedly the Plans agreed to pay its providers' MNCare Tax liability—which is wrong for the same reason its fiduciary-status argument is wrong.   And third, BCBSM argues that, even if it was a fiduciary and breached its duties, there is no ERISA remedy available to the Secretary to redress BCBSM's illegal actions since the Plans did not suffer an injury, but that is wrong for the same reason that dooms its standing argument.

### A.   BCBSM Was a Named Fiduciary and Functioned as Such by Unilaterally Charging the Plans for its Providers Tax Liability

*1.   BCBSM was a named fiduciary vested with discretionary authority over claims*

In disclaiming fiduciary status, BCBSM initially argues that it cannot be considered a fiduciary under the third prong of ERISA's fiduciary definition, which assigns fiduciary status to a person that "*has* any discretionary authority or discretionary responsibility in [plan]

administration." 29 U.S.C. § 1002(21)(A)(iii) (emphasis added). That provision recognizes that entities are fiduciaries when they are conferred discretionary administrative power by the plan's governing documents, i.e., when they are named as such. BCBSM admits it was vested with such authority, but only to decide *whether* to approve a claim—yea or nay—not the amount of the payment, which is determined by the terms of the Plans. Def.'s Mem. at 19–20. In other words, as BCBSM would have it, BCBSM dons its fiduciary hat when evaluating a claim's eligibility to be paid, but then immediately removes it when evaluating the intimately bound-up question of how much to pay.

BCBSM parses its powers too finely: The ASAs broadly make BCBSM "the named fiduciary of the Plan for purposes of Claims[.]" Def.'s Ex. 1, Art. II., § 6. And the SPDs likewise name BCBSM the "claims administrator." *See* Sec'y's Ex. 1 at 44, 57, 73, 83, 86; Compl. ¶ 14. True, BCBSM, as a fiduciary, is required to pay out only what the Plans authorize (which is the heart of this case), but that does not mean it was not acting as a fiduciary in deciding those payments. Among ERISA's core fiduciary duties, after all, is to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Indeed, when BCBSM determines "whether a Claim is eligible to be paid"—the activity for which BCBSM concedes it was conferred discretion and has fiduciary status—the ASA requires it do so "in accordance with the criteria of the Plan and/or directions of Employer[.]" Def.'s Ex. 1, Art. II., § 1. BCBSM's argument thus collapses under the weight of its own internal contradictions.

This argument also fails because it denies factual allegations rather than challenging the sufficiency of the pleadings. *See In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig*., 312 F. Supp. 2d 1165, 1181 (D. Minn. 2004). Whether an entity acted as a fiduciary is generally a

fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss. *See Jump v. Speedway LLC*, 23 F. Supp. 3d 1024, 1031 (D. Minn. 2014) (finding that "it would be premature to determine a defendant's fiduciary status at the motion to dismiss stage of the proceedings, because a determination of fiduciary status based on function is a mixed question of law and fact"); *see also Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005) ("The question whether a party is an ERISA fiduciary is a mixed question of law and fact."). Thus, BCBSM's denying the allegations that it acted as a fiduciary when charging the Plans for the MNCare Tax is not a basis for dismissing the complaint. *See In re Xcel Energy*, 312 F. Supp. 2d at 1181.

> ## 2. *BCBSM was also a functional fiduciary because it exercised discretionary authority over plan management in deciding to charge the Plans for its providers' MNCare Tax liability*

This Court need not even concern itself with the third prong of ERISA's fiduciary definition, because BCBSM also "exercise[d] discretionary authority" over the Plans' management by charging them for its providers' MNCare Tax liability on its own accord without authority to do so, making it a functional fiduciary under the definition's first prong. *See* 29 U.S.C. § 1002(21)(A)(i).

BCBSM takes aim at this basis for fiduciary status by first engaging in more parsing: Paying claims, BCBSM says, "concerns administrative (not management) matters," and thus cannot qualify as an activity that triggers fiduciary status under ERISA's functional definition. *See* Def.'s Mem., ECF No. 11, at 22. To support its novel position, BCBSM directly undermines its own argument by citing a dictionary definition that defines "manage" as "to exercise executive, *administrative*, and supervisory direction." *Id.* In any case, the conduct challenged in the complaint is not "the routine payment or billing of claims," *id.* at 22—as if the Secretary is

suing a back-office clerk—but rather BCBSM's unilateral, executive decision to pass its providers' MNCare Tax on to the Plans without their authorization. The complaint alleges that BCBSM charged the Plans for the tax even though under the ASAs and the SPDs, the Plans did not agree to pay the providers' MNCare Tax obligations. *See* Compl. ¶¶ 16, 25–31. Relatedly, the Secretary alleged that the providers did not transfer the tax to the Plans and did not include the tax in their invoices relating to services provided to the Plans' participants. *Id.* ¶ 21; *see also* Sec'y's Ex. 2 at 8-40. Courts have deemed similar conduct to qualify as discretionary plan management. *See, e.g.*, *Peters*, 2 F.4th at 231 (holding plaintiff produced sufficient evidence to show third-party administrator acted as functional fiduciary by exercising discretionary control over management and administration of the plan when it improperly charged fees to the plan); *Negron v. Cigna Health*, 300 F. Supp. 3d 341, 355 & 356 (D. Conn. 2018) (denying motion to dismiss where plaintiff alleged that third-party administrator exercised authority over the management of the plans by charging cost-sharing payments contrary to the terms of the plans).

BCBSM next argues that even if its actions qualify as plan management, it did not exercise any "discretion" because the ASAs purportedly allow it to charge the Plans for the MNCare Tax that BCBSM separately agreed with its Participating Providers to pay on their behalf. *See* Def.'s Mem., ECF No. 11, at 22–25. This argument fails because it conflicts with the plain terms of the ASAs and the SPDs, under which the Plans agreed only to pay for medical services. For example, "Claim" is defined in the ASA as a "request for payment of medical services that are covered or alleged to be covered" (Art. I, Section 7) and "Claims Paid" is the dollar amount Blue Cross pays under the Plan" (Art. I, Section 8). The SPDs similarly define "claim" in terms of a payment for a "covered service," which is defined as a "*health service or supply* that is eligible for benefits when performed and billed by an eligible provider." Sec'y's

Ex. 1 at 86 (emphasis added).  And the "Allowed Amount" payable to Participating Providers is similarly tethered to a "covered service," specifically "the negotiated amount of payment that the in-network provider has agreed to accept as full payment for a *covered service* at the time [a] claim is processed."  *Id.* at 84.

Because these interlocking provisions show that the Plans agreed to pay only for medical services provided to their participants, the MNCare Taxes cannot properly be considered part of a claim to which the Plans agreed to pay.  The MNCare Tax is imposed on the gross receipts of health care providers who bear the obligation for payment.  *See* Minn. Stat. § 295.52, Subdivision 2; Minn. Stat. § 295.50, Subdivision 3; Minn. Dep't of Revenue, Revenue Notice 94-l2 (Modified Nov. 8, 2004).  It is not a sales tax imposed on patients for medical services. *See Bloom*, 841 F. Supp. at 281.  As such, the ASA's definition of "Claims Paid" and the SPD's definition of "Allowed Amount" exclude payment for the MNCare Tax, which is not a payment for medical services.

Nor does any other provision of the Plans or ASAs allow BCBSM to pass the tax on to the Plans.  While the ASAs provide for the payment of provider taxes where "a regulatory authority" determines that provider taxes are due, *see* Def.'s Ex. 1, Art. V § 4, that provision is not a legitimate basis for BCBSM's causing the Plans to pay the MNCare Tax.  Although Minnesota law allows health care providers to transfer the MNCare Tax to BCBSM, *see* Minn. Stat. § 295.582, Subdivision l(c)(1), as outlined *supra*, the providers did not transfer the tax to BCBSM.  Rather, BCBSM unilaterally volunteered to collect the taxes from the Plans without receiving affirmative requests to do so from the providers, as would be the case if the tax was in fact formally transferred.  *See* Minn. Dep't of Com., Bulletin 94-3 ¶ 1 (July 18, 1994) ("If requested to do so, an insurer must reimburse a provider for 2% of the gross revenues received

by the provider under a third party contract.").  BCBSM instead elected as a gratuity to pay the

MNCare Tax even though the providers never included those taxes on their invoices.  In short, no

regulatory authority required the Plans to pay for BCBSM's Participating Providers' taxes.

Setting aside BCBSM's lack of authority to pass along taxes to the Plans, BCBSM

contends, without support, that its providers included their liability for the MNCare Tax in the

claims submitted to BCBSM.  The Secretary alleges they did not.  Compl. ¶ 21.  That allegation

is buttressed by BCBSM's provider manual requiring the providers to identify the tax in the

AMT tax segment portion of the claim remittance to BCBSM.  *See* Sec'y's Ex. 2 at 8-30, 8-40.

The Secretary alleges that the providers servicing participants of the Plans did not include the

MNCare Tax in their invoices when submitting their claims.  *See* Compl. ¶ 21.  Despite the

providers' not including the tax as part of their claim submissions, BCBSM "exercised its

discretionary authority over claims administration to cause the Plans to pay the providers'

obligations under the MNCare Tax based on billing practices that obscured the taxes it collected

from the Plans."  *Id*. ¶ 32.  BCBSM cannot obtain dismissal of the complaint by denying those

factual allegations that adequately state a claim for relief based on fiduciary misconduct.  *See In

re Xcel Energy*, 312 F. Supp. 2d at 1181.

Finally, BCBSM cites *McCaffree Financial Corp. v. Principal Life*, 811 F.3d 998 (8th Cir.

2016), in support of its argument that it was not a functional fiduciary, but its reliance on that

decision is misplaced.  The plan sponsor there contracted with an insurance company (Principal)

to provide participants in a defined contribution pension plan a slate of options for investing in

mutual funds.  *See id.* at 1001.  The contract specified that participants would pay Principal

management fees and operating expenses within defined parameters, including necessary

expenses and taxes and fees paid to third parties.  *Id*.  The Eighth Circuit agreed under those

circumstances that Principal was not a fiduciary with respect to the fees it charged because the contract identified the fees as the responsibility of the participants. *Id*. at 1003. The plaintiff failed to allege a fiduciary action with respect to those fees because the complaint challenged "precisely those fees to which the parties contractually agreed." *Id*. at 1004.

*McCaffree* is irrelevant here because paying the Participating Providers' MNCare Tax is not something to which the Plans "contractually agreed." Unlike the *McCaffree* plaintiff's allegations that Principal charged only agreed upon fees, *id*. at 1004, the Secretary alleges that BCBSM charged the Plans for the MNCare Taxes contrary to the Plans' governing documents. *See* Compl. ¶¶ 16, 23, 26–31.[5] Again, the ASAs and SPDs in this case do not specifically address the Plans paying the MNCare Tax, unlike the contractual provisions in *McCaffree* specifically authorizing Principal to charge participants "various taxes and fees Principal paid to third parties." 811 F.3d at 1001; *see also* Def.'s Mem., ECF No. 11, at 23–24 (quoting the contractual language authorizing Principal to collect "taxes" as included within "operating expenses"). Thus, the holding in *McCaffree* does not apply here because the Secretary's allegations do not involve the Plans' paying of taxes as authorized by contract with BCBSM. *See Rozo v. Principal Life*, 949 F.3d 1071, 1074 (8th Cir. 2020) (distinguishing *McCaffree*).[6]

---

[5] Unlike BCBSM's authority under the SPDs, *McCaffree* also did not involve a named fiduciary. *See* 811 F.3d at 1002; *see also Nelsen v. Principal Global Invs.*, 362 F. Supp. 3d 627, 636 (S.D. Iowa 2019). For that reason, BCBSM's fiduciary status was triggered based on its Plan-conferred authority as claims administrator. *See* Sec'y's Ex. 1 at 83, 86; *see also* 29 U.S.C. § 1102(a)(2).

[6] Even if the terms of ASAs and the SPDs did not plainly exclude the Plans' responsibility for paying the tax, BCBSM's contrary interpretation creates a dispute of fact that provides no basis for dismissing the Secretary's complaint. *See In re EpiPen ERISA Litig.*, 341 F. Supp. 3d 1015, 1019 (D. Minn. 2018).

3.   *BCBSM was a fiduciary because it exercised authority over plan assets*

Another basis for BCBSM's functional fiduciary status is its exercise of "any authority" over the Plans' assets. 29 U.S.C. § 1002(21)(A)(i). As alleged in the complaint, BCBSM lacked authority under the ASAs and the SPDs to charge the Plans for its providers' MNCare Tax liabilities yet surreptitiously billed the Plans for it anyway. Compl. ¶¶ 24–31. By including the MNCare Tax amounts in the Plans' invoices, which the Plans then paid, BCBSM caused the Plans to expend Plan assets to pay those improper charges. Indeed, the monies BCBSM improperly caused the Plans to pay included employee contributions that are defined by regulation as plan assets. Compl. ¶¶ 8, 24; *see also* 29 C.F.R. § 2510.3-102(a)(1); *LoPresti v. Terwilliger*, 126 F.3d 34, 39–40 (2d Cir. 1997). In that way BCBSM exercised "any authority" over the Plans' assets.

BCBSM argues it never received plan assets because once the Plans paid BCBSM for the charges it passed on to them, the Plans no longer had a property interest in those amounts. *See* Def.'s Mem., ECF No. 11, at 26–27. But it does not matter whether the amounts paid by the Plan to BCBSM lost their Plan-asset status once paid. The point is that they were Plan assets *before* being paid, and that BCBSM exercised "any" authority over *those* Plan assets by surreptitiously and without authorization billing the Plans for its providers' MNCare Tax obligations.

BCBSM also reiterates the flawed argument that it did not deal with plan assets because it simply charged the Plans according to a contractually agreed-upon rate. *See* Def.'s Mem., ECF No. 11, at 27. Those arguments fail for the reasons detailed under Section III.A.2., *supra*, that BCBSM lacked authority under the ASAs and the SPDs to charge the Plans for the MNCare Tax. BCBSM's reliance on cases where the courts found service providers only collected

agreed-upon fees is thus entirely misplaced.  *See id*. at 25 n. 1 & 27.  Unlike those cases,

BCBSM's unauthorized collection of plan assets to which it was not entitled presents a

materially distinct set of circumstances triggering its status and liability as a fiduciary.  *See*

*LoPresti*, 126 F.3d at 40.

### B.  BCBSM's Argument that the Secretary Did Not Properly Plead ERISA Violations Fails for the Same Reason as its Fiduciary Status Argument

In arguing that the complaint does not plausibly allege a fiduciary breach or prohibited

transactions even if BCBSM was a fiduciary, BCBSM repeats again its factual dispute that it was

authorized to collect the MNCare Tax from the Plans.  *See* Def.'s Mem., ECF No. 11, at 28–29.

The Secretary already addressed the fundamental flaws with that argument in Section III.A.2.,

*supra*.  The only additional contention on this score that requires a response is BCBSM's

argument that the providers included the tax in their invoices by increasing their charges to

incorporate the tax as overhead.  *See* Def.'s Mem., ECF No. 11, at 30.

But that argument suffers from its own fatal flaw.  The Secretary alleged that the

providers did *not* include the MNCare Tax when submitting claims to BCBSM.  Compl. ¶ 21.

BCBSM's argument to the contrary is a factual dispute that the Court cannot resolve on a motion

to dismiss.  *See In re Xcel Energy*, 312 F. Supp. 2d at 1180.  In any event, the documents

BCBSM proffered in support of its factual contention cut against its argument.  The provider

agreement states that *BCBSM* will add the MNCare Tax amount to the fixed fees paid to the

provider or include the tax whenever the payment is assessed on a percentage basis.  *See* Def.'s

Ex. 3 at 9-11; Def.'s Ex. 4 at 15.  The provider manual also states that it does not require

providers to charge group purchasers for the MNCare Tax.  *See* Sec'y's Ex. 2 at 8-40.  Rather, if

the provider wants to include the MNCare Tax in its charges, it must report the tax in its AMT

tax segment line.  *Id*.  The Secretary relatedly alleges that the providers did not do this.  Compl.

¶ 21.  Rather, BCBSM, without authority, added the tax to the fees it charged the Plans.  Compl.

¶ 22.  BCBSM's factual dispute concerning that issue cannot be resolved on a motion to dismiss.

### C.  BCBSM is Wrong that ERISA Does Not Afford the Secretary a Remedy

Contrary to BCBSM's contention, the Secretary adequately alleged that the Plans

suffered losses, and therefore relief is available under 29 U.S.C. § 1132(a)(2) to restore losses to

the Plans.  *See* 29 U.S.C. § 1109(a).  The complaint alleges that BCBSM violated ERISA by

charging the Plans, without authority, for BCBSM's obligations to compensate its providers for

their tax liability.  During the timeframe alleged in the complaint, BCBSM improperly passed on

those taxes to the Plans, causing them to suffer economic losses.  In response, BCBSM repeats

the misguided argument it made as to standing—that there are no losses to the Plans because, if

the tax had been disclosed on invoices, other fiduciaries of the Plans would have hypothetically

agreed to pay the tax.  Def.'s Mem., ECF No. 11, at 31.  That counterfactual situation, however,

has no bearing on the losses suffered by the Plans under the actual circumstances.  Moreover, as

outlined in Section I, *supra*, the argument fails because it assumes the other fiduciaries would be

willing to approve charges that the Plans were not required to pay, in violation of their fiduciary

duties to the Plans.  *See* 29 U.S.C. § 1104(a)(1)(A)(ii), (B); *see also* Restatement (Third) of

Trusts § 76, cmt. d (Am. Law Inst. 2007) (duty to preserve trust assets).

BCBSM further contends the complaint does not allege facts to show that it profited from

the payment of its providers' MNCare Tax obligations, but that argument also fails.  As alleged,

BCBSM "unilaterally volunteered to compensate network providers for their liability under the

MNCare Tax and then caused the Plans to pay the tax."  Compl. ¶ 21.  That allegation raises a

reasonable inference that BCBSM undertook a contractual obligation to pay the providers'

MNCare Tax obligations.  BCBSM's provider agreements also reinforce the point that it assumed

an obligation to compensate its providers for their tax obligations.  *See* Def.'s Ex. 4.  By recouping tax payments from the Plans, which BCBSM would otherwise have been responsible for paying, BCBSM profited from its decision to cause the Plans to pay the network providers' MNCare Tax obligations.  Because the complaint sufficiently alleges BCBSM profited from its unauthorized actions by causing the Plans to pay its expenses, relief is available under 29 U.S.C. § 1132(a)(2) in the form of BCBSM's personal liability for the Plans' losses and disgorgement of BCBSM's unjust profits.  *See* 29 U.S.C. § 1109(a).

An injunction is also available under either 29 U.S.C. § 1132(a)(2) or 29 U.S.C. § 1132(a)(5).  *See Mertens*, 508 U.S. at 256; *Shaver v. Operating Eng'rs Loc.*, 332 F.3d 1198, 1203 (9th Cir. 2003).  BCBSM contends that an injunction is unavailable because the Secretary does not allege that its illegal practices are "ongoing" but instead that they "occurred from 2016 to 2020."  Def.'s Mem., ECF No. 11, at 31–32.  But the Complaint refers to the 2016–2020 time period only to identify the known losses to the Plans, not to suggest that BCBSM's actions stopped at that point; indeed, the Complaint open-endedly alleges that "*since January 1, 2015*, BCBSM has added the MNCare Tax payable by its in-network providers to the amount that BCBSM charges to the Plans for the payment of claims."  Compl. ¶ 22 (emphasis added).  In any case, it is well established that a "court's power to grant injunctive relief survives discontinuance of the illegal conduct."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).  BCBSM has made no promises to cease its illegal conduct, but even if it does discontinue the offending practice and attests that it has no intention to revive it, this "profession . . . is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts."  *Id*.; *cf. FBI v. Fikre*, 144 S. Ct. 771 (2024) ("None of this implies that a

defendant may automatically moot a case by the simple expedient of suspending its challenged conduct after it is sued.") (cleaned up).

Even if injunctive relief were not available, it is "well-settled law that . . . the selection of an improper remedy in the Rule 8(a)(3) demand for relief will not be fatal to a party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type." *A.G. Spectrum Co. v. Elder*, 181 F. Supp. 3d 615, 617 (S.D. Iowa 2016) (quoting *Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp. LLC*, 635 F.3d 1106, 1108 (8th Cir. 2011)).  The complaint therefore only needs to raise a reasonable inference that some type of equitable relief is available to survive a motion to dismiss.  The complaint here satisfies those lenient standards because it alleges that a breaching fiduciary of the Plans used its fiduciary position to cause losses to the Plans.  Under those circumstances, a surcharge remedy against BCBSM is appropriate equitable relief.  *See CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011).

### D.  The Secretary Alleges BCBSM's Liability as a Fiduciary, Not as a Non-Fiduciary Knowing Participant

Apparently reading too much into the complaint's reference to BCBSM as a "a party in interest," BCBSM argues that it cannot be held alternatively liable as a non-fiduciary party in interest who "knowingly participated" in ERISA violations committed by the Plans.  Def.'s Mem., ECF No. 11, at 32.  BCBSM misapprehends the import of the Secretary's reference to BCBSM's status as a party in interest to the Plans.  The Secretary did not allege that BCBSM, based on its status as party in interest, is liable as a non-fiduciary knowing participant in the *Plans'* fiduciary breaches—breaches the Secretary did not even allege.  Rather, the Secretary alleged that BCBSM is liable as a fiduciary for its *own* breaches and prohibited transactions when it had plan assets transferred to itself, a party in interest (since fiduciaries are also parties in

interest).  Compl. ¶ 39; *see also* 29 U.S.C. § 1106(a)(1)(D).  BCBSM's counterarguments against an imagined claim that the Secretary did not make are thus entirely irrelevant.

## CONCLUSION

Based on the foregoing, the Court should deny BCBSM's motion to dismiss.

Dated: April 15, 2024                                    Respectfully submitted,

                                                        SEEMA NANDA
                                                        Solicitor of Labor

                                                        WAYNE R. BERRY
                                                        Associate Solicitor
                                                        Plan Benefits Security Division

                                                        JEFF HAHN
                                                        Counsel for Appellate and Special Litigation
                                                        Plan Benefits Security Division

                                                        GEOFFREY FORNEY
                                                        Trial Attorney
                                                        PA 202870; ME 006734; NJ 036232006

                                                        /s/Dana Florkowski
                                                        DANA FLORKOWSKI
                                                        Trial Attorney
                                                        DC 1659708, VA 93499

                                                        United States Department of Labor
                                                        200 Constitution Ave. NW, N-4611
                                                        Washington, DC 20210
                                                        202-615-8315/ forney.geoffrey.d@dol.gov

                                                        Attorneys for Plaintiff