UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JULIE A. SU, *Acting Secretary of Labor*,

Plaintiff,

v.

BCBSM, INC.,

Defendant.

Civil No. 24-99 (JRT/TNL)

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

---

Dana Marie Florkowski and Geoffrey Forney, **UNITED STATES DEPARTMENT OF LABOR, PLAN BENEFITS SECURITY DIVISION**, 200 Constitution Avenue Northwest, Suite N-4611, Washington, DC 20210, for Plaintiff.

Anthony F. Shelley and Rebecca Tweedie, **MILLER & CHEVALIER CHARTERED**, 900 Sixteenth Street Northwest, Washington, DC 20006; Danielle W. Fitzsimmons, Kevin P. Hickey, and Peggah Navab, **BASSFORD REMELE**, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, for Defendant.

Defendant BCBSM, Inc. administers self-funded ERISA plans for employers, including by establishing rates that the self-funded plans agree to pay network providers. BCBSM agreed to reimburse providers in its network for their MNCare Tax liabilities and passed along those reimbursement expenses to the plans. Acting Secretary of Labor Julie A. Su ("the Secretary") brought this action pursuant to her ERISA enforcement authority, alleging that the plans did not agree to the tax reimbursements, that reimbursement was a gratuitous offer by BCBSM, and that BCBSM thus engaged in prohibited transactions and violated its fiduciary duties by using plan assets to pay the providers' MNCare Taxes

without the plans' knowledge or consent. BCBSM now moves to dismiss, arguing the Secretary does not have standing because she has not pled a concrete injury caused by BCBSM's billing practices, and alternatively fails to state a claim because BCBSM was not acting as a fiduciary and did not violate any duties. Many issues in this case present close calls. But the Court will deny BCBSM's Motion to Dismiss and allow the action to proceed.

## BACKGROUND

### I. PLAN ADMINISTRATION

BCBSM is a third-party administrator ("TPA") for approximately 370 self-funded employee healthcare plans ("the plans") in Minnesota. (Compl. ¶¶ 4, 7, Jan. 12, 2024, Docket No. 1.) BCBSM's relationship with the plans is governed by service agreements ("SA") and Summary Plan Descriptions ("SPD"). (Compl. ¶¶ 9, 11–14; Decl. Doreen A. Mohs Supp. Mot. Dismiss ("Mohs Decl."), Ex. 1 ("SA"), Mar. 18, 2024, Docket No. 14; Resp. Opp'n Mot. Dismiss, Ex. 1 ("SPD"), Apr. 15, 2024, Docket No. 25.) BCBSM also contracts with healthcare providers who enter BCBSM's network and accept negotiated rates as payment for their health services. (Compl. ¶ 10.)

BCBSM performs two primary services for the plans. First, the plans receive access to BCBSM's provider network and negotiated rates. (SA at 12–13.) Second, BCBSM administers employee claims for coverage. (*Id.* at 9–11.) When an employee submits a claim, BCBSM approves or denies the claim after applying plan criteria. (*Id.* at 9–10.) It acts as a named fiduciary of the plans when deciding whether to approve a claim. (*Id.* at 10, 25.) If BCBSM approves a claim, it pays the negotiated amount to the provider from

its own funds.  (*Id.* at 10, 12.)  The plan must then reimburse BCBSM for claim payments on a weekly basis.  (*Id.* at 25, 47.)

## II.     MNCARE TAX PAYMENTS

Since 1994, Minnesota has taxed providers' gross revenues from patient services. Minn. Stat. 295.52; (Compl. ¶ 18.)  The current rate for the MNCare Tax is 1.8%.  Minn. Stat. § 295.52 subd. 2.  BCBSM agreed to cover network providers' MNCare Tax liabilities as follows:

> For all Health Services paid based upon a "fixed fee" method (e.g., fee schedule amounts, per diem amounts, per case amounts, etc.) . . . Blue Cross shall add an amount representing the tax to such fixed payments (e.g., if the fee schedule amount is $100.00 and the then- current tax percentage is 2.0%, Blue Cross shall pay Provider $102.00). For all Health Services paid at Regular Billed Charge or a percentage of Regular Billed Charge, the amount billed to Blue Cross by Provider shall be deemed to include the then current tax amount and Blue Cross shall <u>not</u> increase its payment by the applicable tax percentage amount for such claims (e.g. if Provider is paid on a 70% of Regular Billed Charge basis, and Provider's Regular Billed Charges is $100.00, Blue Cross shall reimburse the Provider $70.00).

(Mohs Decl., Ex. 4 at 10.)

Although the MNCare Tax is levied on providers, they may transfer liability to third-party payees, either explicitly or by raising prices.  Minn. Stat. § 295.582 subd. 1(a)(1), 1(c)(1), 1(e); *Boyle v. Anderson*, 68 F.3d 1093, 1098 (8th Cir. 1995).  Nonetheless, the Secretary alleges that BCBSM did not disclose, and the plans never agreed to pay, the MNCare Tax reimbursement.  (Compl. ¶ 23.)  The Secretary alleges that BCBSM, not the

plans, was liable for BCBSM's agreement with providers to pay the tax. (*Id.* ¶¶ 21, 39.) Accordingly, the Secretary alleges that BCBSM violated its fiduciary duties and engaged in prohibited transactions by recouping nearly $67 million from the plans for its own MNCare reimbursement liabilities between 2016 and 2020. (*Id.* ¶¶ 2, 34–56.)

The Secretary brought this action pursuant to her statutory enforcement authority, seeking to recover MNCare Tax payments billed to the plans from 2016 through 2020 and to enjoin BCBSM from reinstating such practices. (*Id.* ¶ 3; *id.* at 12); 29 U.S.C. § 1132(a)(2), (a)(5). BCBSM moves to dismiss the Secretary's Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim. (Mot. Dismiss, Mar. 18, 2024, Docket No. 9.)

## 12(B)(1) MOTION

### I. STANDARD OF REVIEW

The Constitution limits federal-court jurisdiction to cases or controversies. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citing U.S. Const. art. III, § 2). Accordingly, the Secretary must demonstrate standing to sue by showing that BCBSM caused an injury in fact that is likely to be redressed by the relief sought. *Id.* at 338.

A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction, including for lack of standing, and requires the Court to examine whether it has authority to decide the claims. *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1063 (D. Minn. 2013). The party seeking to invoke a federal court's subject matter jurisdiction bears the burden of showing that the court has jurisdiction. *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817,

822 (8th Cir. 2011). That party must meet its burden "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* A court must dismiss an action if it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

**II.   ANALYSIS**

The Secretary's theory of standing is simple and suffices at the pleading stage. According to the Secretary, BCBSM charged the plans nearly $67 million dollars for MNCare Tax liabilities that the plans did not owe and did not agree to pay. That is a concrete injury, caused by BCBSM's billing practices and redressable by a damages award. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").

BCBSM's counterargument that the alleged injury is too speculative is intuitively appealing. If the rates BCBSM paid to providers were all negotiated, how those rates were itemized was likely not all that impactful to the final numbers. *Cf. Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 317 n.6 (2012) (emphasizing the fungibility of money). Take the following hypothetical example. Say HealthPartners has a sticker price of $150 to administer an HPV vaccination. HealthPartners joins BCBSM's network and negotiates a $100 rate for HPV vaccinations. Under the provider agreement, BCBSM will additionally

pay $1.80 to cover HealthPartners's 1.8% percent tax liability on the $100 bill. What matters to HealthPartners is the total payment of $101.80. Whether that is calculated as $100 for services plus $1.80 for tax or $101.80 for services with no tax compensation does not matter. So if BCBSM was not allowed to pay the $1.80 for tax compensation, their negotiations likely would have resulted in a $101.80 total payment for services with no tax compensation.[1]

Thus, under the Secretary's theory of how the billing should have worked—with no tax liability—the healthcare providers would have negotiated higher base level rates for services and the ERISA plans would have ultimately paid the same amount of money. Likewise, the plans would not have balked at paying $101.80 for services, and thus were not injured by paying $100 for services plus $1.80 for taxes. All that may well turn out to be true. But BCBSM's theory presents a question of fact that is inappropriate for judgment on the pleadings. The Court cannot be sure that BCBSM's hypothetical negotiations would have worked so neatly in practice, or that the plans would have no objections. The Court will thus allow the parties a chance to develop the record before ruling on this fact-bound issue.

BCBSM also leans on *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020) to contest the Secretary's standing. There, participants in a defined-benefit plan brought an ERISA

---

[1] *See* Minn. Stat. 295.582 subd. 1(e) ("Nothing in this section limits the ability of" a healthcare provider to "recover all or part of" their MNCare Tax "obligation by other methods, including increasing fees or charges.").

action for plan mismanagement. *Id.* at 540–41. Nonetheless, their benefits were fixed and did not depend on plan performance, they had consistently received their monthly benefits, and there were no indications that future payments were at risk. *Id.* Emphasizing that "[t]here is no ERISA exception to Article III," the Supreme Court found the plaintiffs lacked standing because they had not suffered any losses. *Id.* at 541, 547. Unlike the plaintiffs in *Thole*, the Secretary alleges losses here—the nearly $67 million of improperly billed MNCare Taxes.

Finally, BCBSM claims that the plans did not suffer injuries because the plan documents required the plans to pay whatever amounts BCBSM negotiated with providers, including MNCare Tax expenses. In other words, there was no injury because the Secretary is wrong on the merits. Because the Court will not collapse the merits of the case into a standing question, *see Peters v. Aetna Inc.*, 2 F.4th 199, 217 (4th Cir. 2021), the Court will address this argument in the breach section, below.

### 12(B)(6) MOTION

### I. STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the Complaint as true to determine if the Complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the Complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665

(8th Cir. 2009). Although the Court accepts the Complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or mere "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quotation omitted). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

At the motion to dismiss stage, the Court may consider the allegations in the Complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). The Court may also consider exhibits attached to the pleadings, as long as those documents do not conflict with the Complaint.[2] *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

## II. ANALYSIS

The Secretary plausibly alleges BCBSM was a functional fiduciary because it had authority and control over plan assets. And she plausibly alleges that BCBSM breached its fiduciary duties and engaged in prohibited transactions. Accordingly, the Court will deny BCBSM's motion to dismiss for failure to state a claim.

---

[2] The Court relies on the SA, SDP, and other contractual materials attached as exhibits by both parties.

### A. Fiduciary Status

As an initial matter, BCBSM must have been acting as a fiduciary when it took the challenged actions to be liable for a breach of fiduciary duties. *See McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016). An entity may act as a named fiduciary, 29 U.S.C. § 1102(a)(2), or as a functional fiduciary, 29 U.S.C. § 1002(21)(A). Though BCBSM was not acting as a named fiduciary when it charged the plans for MNCare Tax reimbursements, the Secretary plausibly alleges that BCBSM was a functional fiduciary.

#### 1. Named Fiduciary

An entity that "is named in the plan instrument" as a fiduciary incurs fiduciary obligations under ERISA. *See* 29 U.S.C. § 1102(a)(2). But fiduciary status is not all or nothing. Rather, fiduciary liability only attaches if a "person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). BCBSM is shielded by that piecemeal fiduciary inquiry. The SA clarifies that "Blue Cross agrees to act as the named fiduciary of the Plan for purposes of Claims, Adverse Benefit Determinations and subrogation services . . . . Employer retains fiduciary obligations for all matters not specifically delegated to Blue Cross. (SA at 25.) "Claims" is a narrowly defined term. A Claim is a "request for payment or medical services that are covered or alleged to be covered under the Plan." (*Id.* at 4.) "Claims Paid," on the other hand, is "[t]he dollar amount Blue Cross pays under the Plan." (*Id.*)

"Claims" concerns **whether** BCBSM approves payment, whereas "Claims Paid" concerns the **amount** of payment. BCBSM only expressly shoulders fiduciary status for "Claims," not "Claims Paid." Therefore, it only acts as a named fiduciary when deciding whether to issue payment, not when deciding the amount of payment. Because the decision to pay the MNCare Tax affects the amount rather than approval of payment, it is not covered under BCBSM's limited acceptance of named fiduciary responsibilities.[3] Fiduciary status may still attach based on a functional inquiry. But BCBSM was not acting as a named fiduciary when paying providers' MNCare Tax obligations.

### 2. Functional Fiduciary

Even if unnamed, ERISA imposes fiduciary duties on any entity that "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). While BCBSM did not act with discretionary authority respecting management of the plans, it exercised authority over plan assets and thus was a functional fiduciary.

#### a. Discretionary Authority Over Plan Management

The Secretary first argues that BCBSM exercised discretionary authority over plan management by unilaterally paying MNCare Tax reimbursements without the plans'

---

[3] Additional provisions within the SA reinforce the Court's interpretation. (*See* SA at 12 ("In negotiating, contracting, or enforcing" provider agreements, "Blue Cross owes no duties or obligations to Employer.").)

knowledge or consent. But even if the contracts did not allow BCBSM to bill the plans for providers' tax liabilities, BCBSM would still not necessarily exercise discretionary management authority when doing so. A TPA does not exercise discretion simply by breaching a contract or violating plan terms. *See Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 321 (1st Cir. 2023) ("The complaint's allegations concern actions alleged to violate BCBSMA's contractual obligations, but as to which BCBSMA had no discretion."). *But see Peters*, 2 F.4th at 231 (provider acted with discretionary authority when it passed along a fee "without authority under the Plan and in direct violation of" plan documents).

More relevant to the Court's analysis is whether BCBSM engaged in discretionary management functions when negotiating provider rates, including tax reimbursements. BCBSM's rate negotiation is "independent from the relationship between" itself and the plans. *See Mass. Laborers'*, 66 F.4th at 310; *accord DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 747 (6th Cir. 2010); (SA at 12 ("In negotiating, contracting, or enforcing [provider] agreements, Blue Cross owes no duties or obligations to Employer.").) As the Sixth Circuit has explained, assigning fiduciary status for TPA-wide negotiations "would be self-defeating." *DeLuca*, 628 F.3d at 747.

> The financial advantage underlying BCBSM's rate negotiations arises from the market power that BCBSM has as a large purchaser of health-care services. BCBSM is continuously in the process of re-negotiating prices for its three health-care coverage options and, thus, must continuously determine how much of that market power to allocate to achieving

-11-

> discounted prices for each of these options. If, however, BCBSM would be required to negotiate solely on a plan-by-plan basis, as a practical matter its economic advantage in the market would be destroyed, damaging its ability to do business on a system-wide basis, ultimately to the [employee plan's] disadvantage.

*Id.* Accordingly, the Court finds that BCBSM did not operate in a discretionary management capacity when negotiating reimbursement rates.

### b.     Authority or Control Over Plan Assets

Nonetheless, the Secretary plausibly alleges that BCBSM acted as a functional fiduciary because it exercised authority or control over plan assets. BCBSM was a fiduciary to the extent it exercised **any** authority or control over the plans' assets, regardless of whether that authority or control was discretionary. *See FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994); *Mass. Laborers'*, 66 F.4th at 324–25. A TPA is a functional fiduciary if it "has the ability to convey plan funds unilaterally." *Mass. Laborers'*, 66 F.4th at 327 (citing *Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 271, 275 (3d Cir. 2001)); *see also Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 746–47 (6th Cir. 2014) (assigning fiduciary status when BCBS paid claims from plans' accounts). So when a TPA has "relatively unconstrained check-writing authority over an account containing plan assets," it acts as a fiduciary when it writes those checks. *Mass. Laborers'*, 66 F.4th at 327 n.21. On the contrary, a TPA that requires a plan's authorization to dispose of plan funds does not exercise authority or control over those funds. *Id.* at 327 & n.21.

This case presents facts closer to the former scenario, with BCBSM having unfettered check-writing authority. To be sure, BCBSM does not draw those checks directly from the plans' accounts. It spends its own funds, and the plans are then contractually obligated to reimburse BCBSM. (*See* SA at 25–26.) The question, then, is whether BCBSM's authority to unilaterally encumber a plan's assets is equivalent for ERISA purposes to directly spending that plan's assets.

There is no principled reason to treat BCBSM's unilateral encumbrance of plan funds any differently than if it directly spent the plans' assets. *But see Mass. Laborers'*, 66 F.4th at 329 (hypothesizing that fiduciary duties would not attach if TPAs for self-funded plans would "pay claims in advance and only later be reimbursed by the plans"). In both situations, the triggering events are the same—BCBSM decides to pay a claim—and the end result is the same—the plans' funds are depleted by the amount BCBSM pays. According to BCBSM, adding the middle step of reimbursement dissolves the fiduciary duty that would attach if BCBSM had written a check directly from the plan's account. Under BCBSM's theory, any TPA could dodge otherwise applicable fiduciary duties by adding that rote reimbursement step. *Cf. Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 180 (2020) (warning against interpretations that "open a loophole allowing easy evasion of the statutory provision's basic purposes").[4]

---

[4] As the First Circuit noted, adopting the reimbursement approach is not a complete loophole because it "would force the TPA to play the role of an unsecured lender to the plan." *Mass. Laborers'*, 66 F.4th at 329 (cleaned up). Thus, the TPA would have to weigh the benefit of

Trust law confirms that an encumbrance, not just direct spending, is significant for fiduciary purposes. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11 (1989) (instructing courts to apply principals of trust law in interpreting ERISA's responsibility provisions).

> [A] trustee has power to borrow money for trust purposes and to pledge, mortgage, grant a deed of trust, or otherwise encumber trust property. The trustee has a duty to exercise caution as well as the duty to exercise care and skill in deciding whether and under what terms to borrow money for trust purposes or to grant a security interest in trust property.

Restatement (Third) of Trusts § 86, cmt. d (2007). Whenever BCBSM pays a claim, plan funds are automatically encumbered under the reimbursement provision of the SA. The Secretary has thus plausibly alleged that BCBSM exercises authority over plan funds when it decides to pay a claim and owes the plans corresponding duties as a functional fiduciary.

B.     **Breach**

ERISA requires fiduciaries to discharge their duties "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). If the plans did not owe the MNCare Tax, BCBSM's use of plan assets to pay the tax would not benefit the plans and their participants. BCBSM argues that it was statutorily and contractually authorized to reimburse providers for its MNCare Tax liabilities, agreed to do so as part of its

---

shedding its fiduciary status against the risk of non-payment from the plan. Nonetheless, where those "loans" are repaid every week, BCBSM's exposure is minimal.

negotiated rates with those providers, and thus comported with its fiduciary duties. BCBSM may well prove as much at later stages of this action. But whether BCBSM fairly negotiated to pay the MNCare Tax, and thus whether it was authorized to use plan funds to do so, presents a question of fact that cannot be resolved on a motion to dismiss.

Begin with statutory authorization. Minnesota law allows providers to pass along their tax obligations to self-insured plans, either explicitly or by increasing fees or charges. Minn. Stat. § 295.582 subd. 1; *Boyle*, 68 F.3d at 1098 ("The law permits a provider to transfer the expense of the provider tax to third party purchasers such as . . . self-insured employee health plans."). ERISA does not preempt such pass-throughs. *Boyle*, 68 F.3d at 1110. But the Secretary claims Minnesota law only authorizes transfer of the tax obligation to plans if the providers explicitly request such transfer. *See* Minn. Dep't of Com., Ins. Bulletin 94-3 ¶ 1 (July 18, 1994) ("**If requested to do so**, an insurer must reimburse a provider.") (emphasis added). The Secretary alleges the providers never issued that request. "Rather, BCBSM unilaterally volunteered to compensate network providers for their liability under the MNCare Tax and then caused the Plans to pay the tax." (Compl. ¶ 21.) Taking the factual allegations from the Complaint as true, the Secretary plausibly alleges that the unilateral compensation offer was not authorized by statute.

Contractually, BCBSM points the Court to the provision of the SA allowing BCBSM to negotiate rates with network providers and obligating the plans to reimburse BCBSM

at the negotiated rates.  (SA at 12–13, 25.)  Because MNCare Tax coverage was bargained for in the provider agreements, BCBSM contends the plans authorized such payments.  But the plan documents only authorize BCBSM to file for reimbursement of Claims Paid.  (*Id.* at 47.)  The SA references "medical services" when defining a "Claim," (*id.* at 4,) and the SDP defines a "Claim" as "payment or reimbursement of the charges or costs associated with a covered service," (SDP at 92.)  A covered service, in turn, is a "health service or supply" that is "performed and billed by an eligible provider."  (*Id.* at 93.)  The Secretary argues that a claim, then, only includes medical goods or services, not taxes.

The Court will leave for further factual development the question of whether the taxes were fairly part of the anticipated negotiated rates, or too attenuated from medical services for the plans to be liable.  Where the Secretary alleges that BCBSM discretely passed along the provider taxes without the plans' knowledge, the Court finds it at least plausible that the taxes should not have been included in the negotiated rate as understood by the parties.

### C. Prohibited Transactions

ERISA prohibits a fiduciary from dealing with plan assets for its own interests or for the benefit of any party whose interests are adverse to the plan.  29 U.S.C. § 1106(b).  Because the Secretary plausibly alleges that the plans were not liable for the MNCare Taxes, she also plausibly alleges BCBSM engaged in a prohibited transaction.  In the provider agreement, BCBSM agreed to cover network providers' MNCare Tax liability.  If the plans were not in turn liable to BCBSM, BCBSM would be left holding the bill.  The

Secretary thus plausibly alleges that BCBSM improperly used plan assets to cover its own liabilities. Accordingly, the Court will deny BCBSM's Motion to Dismiss the Secretary's prohibited transaction counts.

### D. Remedy

BCBSM contends that, even if the Secretary alleged a breach, she fails to state a claim because no remedies are available.

BCBSM claims that damages and/or restitution are unavailable because the Secretary does not plausibly allege that the plans would have rejected the tax payments had they been aware of them. Likewise, there is the possibility that the negotiated amount for services would have increased by the disallowed amount of tax coverage to result in the same total costs to the plans. As in the 12(b)(1) analysis, this is a (counter)factual dispute that the Court will not resolve on the pleadings. The Secretary plausibly alleges that the plans should be reimbursed for all tax payments, though that allegation may be undermined upon further factual development.

The record is also insufficient for the Court to hold as a matter of law that injunctive relief is unavailable. This action covers billing from 2016 through 2020. Though the Complaint does not say as much, it appears that BCBSM ceased the challenged billing practices in 2020. Even if it did, though, there is no indication why it changed its practices or if it is likely to revert to its pre-2020 scheme. Accordingly, it is difficult to predict based on the current record whether "the likelihood of further violations is sufficiently remote

to make injunctive relief unnecessary." *See United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968).

## CONCLUSION

Under pleading standards, the Secretary has standing to pursue this action because she plausibly alleges that self-funded plans were financially harmed by BCBSM's passalong of network providers' tax liabilities. She also states a claim upon which relief can be granted because she plausibly alleges BCBSM exercised authority and control over plan assets and failed to act in the plans' best interests. Accordingly, the Court will deny BCBSM's Motion to Dismiss.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Docket No. 9] is **DENIED**.

DATED: August 22, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge